# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>THE ROOMSTORES OF PHOENIX, L.L.C., D/B/A THE ROOMSTORE,<br><br>Debtor.<br>———————————————<br>DAVID GONZALES, CREDITOR TRUSTEE ON BEHALF OF THE ROOMSTORE LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JAMIE R. SELZNICK, AS PERSONAL REPRESENTATIVE OF THE PROBATE ESTATE OF DANIEL P. SELZNICK; MASTERMIND DEFINED BENEFIT PENSION,<br><br>Defendants. | Chapter 11 Proceedings<br><br>Case No.: 2:15-bk-15898-DPC<br><br>Adversary No.: 2:17-ap-00336-DPC<br><br><br>**UNDER ADVISEMENT ORDER**<br><br>**[NOT FOR PUBLICATION]** |

This adversary proceeding ("Adversary Proceeding") concerns the characterization of three sums of money as either loans, equity contributions or equity distributions. David Gonzales ("Plaintiff" or "Trustee"), trustee of the Roomstore Liquidating Trust ("Trust"), seeks the following: (1) to have an obligation ("Selznick Obligation") determined to be due and owing to the Trust from the probate estate of Daniel P. Selznick ("Selznick"); (2) to have the $101,316 proof of claim filed by Selznick ("Selznick Claim") either recharacterized as an equity contribution to the Roomstores of Phoenix, L.L.C.

("Roomstores" or "Debtor") and disallowed in its entirety or equitably subordinated to all allowed unsecured creditors; and (3) to have the $1,262,632.53 proof of claim ("MasterMind Claim") filed by defendant MasterMind Defined Benefit Pension ("MasterMind") either recharacterized as an equity contribution to Roomstores and disallowed in its entirety or equitably subordinated to all allowed unsecured creditors. Selznick and MasterMind ("Defendants") ask the Court to deny Plaintiff's requests to either recharacterize or equitably subordinate the Selznick Claim or the MasterMind Claim and to deny Plaintiff's request to have the Selznick Obligation determined to be due and owing. Selznick contends the Selznick Obligation was actually an equity distribution made by Roomstores to Selznick.

After considering the evidence at trial, hearing the arguments of counsel and reading the parties' briefs, the Court now rules that Selznick owes the Roomstores bankruptcy estate the principal sum of $835,000 plus interest at 4% per annum. The Court also finds that Plaintiff has failed to carry his burden of proof on his claims for equitable subordination or state law recharacterization of debt as equity. Selznick's Claim #306-1 is allowed in the principal amount of $93,334 plus interest at 4% per annum. MasterMind's Claim #307-1 is allowed in the principal amount of $881,666 plus interest at 4% per annum. Since Selznick failed to demonstrate that his claim is entitled to setoff against the debt Selznick owes to Roomstores, Selznick must pay the full amount owed to Roomstores whereas the Selznick Claim against Roomstores is entitled to share pro rata in the 9% to 10% return expected to be paid to unsecured creditors.

## I.    BACKGROUND

Prior to filing its December 18, 2015 ("Petition Date") bankruptcy,[1] Roomstores operated as a furniture retailer with eleven showrooms throughout Arizona. The three members of the Roomstores limited liability company were Alan Levitz (33.5%), Phillip Levitz (33.5%) and Selznick (33%). Selznick passed away prior to the March 7, 2017

---

[1] Administrative DE 1. "Administrative DE" references a docket entry in the administrative bankruptcy case 2:15-bk-15898-DPC.

effective date of the Debtor's confirmed plan of liquidation ("Plan").  Selznick's estate is being administered in a probate proceeding in the Superior Court of Maricopa County.[2] Selznick's daughter, Jamie R. Selznick ("Ms. Selznick"), is the personal representative of the Selznick probate estate.

Defendants filed proofs of claim in the Administrative Case.[3]  On February 21, 2017, an Order Confirming the Plan was entered establishing the Trust and approving Plaintiff as the Trust's liquidating trustee.[4]  Plaintiff commenced this Adversary Proceeding by filing an eight-count complaint against Defendants.[5]  Plaintiff later filed an amended complaint ("Amended Complaint") asserting ten causes of action.[6]  Defendants filed their answer to the Amended Complaint ("Answer").[7]

Plaintiff filed a Motion to Exclude Testimony ("Plaintiff's Motion to Exclude") seeking to have Defendants' expert's testimony excluded from trial.[8]  Defendants filed a Response to Plaintiff's Motion to Exclude.[9]  This Court entered an Order Granting Plaintiff's Motion to Exclude.[10]

Defendants filed a Motion to Exclude Testimony ("Defendants' Motion to Exclude")[11] seeking to have Plaintiff's sole witness, Trustee, excluded from testifying at trial.  Plaintiff filed a Response in Opposition to Defendants' Motion to Exclude.[12]  Prior to the start of the trial, this Court entered an order denying Defendants' Motion to Exclude.[13]

Plaintiff and Defendants filed a Joint Pre-Trial Statement ("Joint Pre-Trial Statement").[14]  On October 1, 2019, this Court conducted a one-day trial ("Trial") and

---

[2] The probate proceeding is case number PB 2017-051044.
[3] See proofs of claim 306-1 and 307-1.
[4] Administrative DE 646 at page 8, paragraph B.
[5] DE 1, June 2, 2017. "DE" references a docket entry in this Adversary Proceeding 2:17-ap-00336-DPC.
[6] DE 3, July 18, 2017.
[7] DE 6, October 20, 2017.
[8] DE 44, September 16, 2019.
[9] DE 51, September 25, 2019.
[10] DE 55, September 26, 2019.
[11] DE 56, September 27, 2019.
[12] DE 57, September 30, 2019.
[13] DE 63, October 1, 2019.
[14] DE 60, September 30, 2019.

3

heard testimony from Ms. Selznick and Trustee. At Trial, Plaintiff dismissed Counts II, VI, VII, VIII, IX and X of his Amended Complaint.[15] The remaining claims are contained in Counts I, III, IV and V.[16] On October, 29, 2019, Defendants filed a Post-Trial Brief ("Defendants' Brief").[17] On the same day, Plaintiff filed Plaintiff's Closing Brief ("Plaintiff's Brief").[18]

## II. JURISDICTION

This Court has jurisdiction over the Adversary Proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

## III. TRIAL

After hearing oral argument on Defendants' Motion to Exclude, the parties delivered brief opening comments. Plaintiff called the Trustee as his sole witness. Defendants called Ms. Selznick as their sole witness.

### A. Testimony of David Gonzales, Trustee

Trustee testified as to the contents of Exhibits 44, 45, 46 and 57 – 66. Trustee testified that Selznick ran the Roomstores until September 2015. Trustee testified that during Selznick's time as manager of Roomstores, Selznick was paid in two different manners: (1) as a consultant through MasterMind and (2) via withdrawals from Roomstores recorded on Roomstores' book as loans.[19]

Trustee testified that Exhibits 44, 45 and 46 were reconciliations prepared by Roomstores or Trustee based on Roomstores' financial records.[20] Exhibit 44 is a summary of the cash paid to Selznick and MasterMind. Exhibit 45 is a summary of the amounts

---

[15] DE 63 at page 3.
[16] *Id.* Count V calls for disallowance of the Selznick Claim and the MasterMind Claim and, therefore, is essentially a subset of the relief sought by Plaintiff in Counts III and IV.
[17] DE 68.
[18] DE 69.
[19] Trial Transcript at DE 64, page 31, lines 19 – 24.
[20] *Id.* at page 40, lines 3 – 11.

4

claimed due to Selznick and MasterMind.  Exhibit 46 is a summary of amounts owed to Philip Levitz, Selznick and MasterMind.

Trustee also testified that Exhibits 57 – 66 (collectively the "Trade Vendor Letters") were letters sent out on a quarterly basis by Selznick to Roomstores' trade vendors.  Specifically, Trustee identified Exhibit 58 as a letter that is substantially similar to all the letters admitted as Exhibits 57 – 66.  Trustee focused on the Exhibit 58 paragraph which states: "From August of 2008 to August 2010 the [Roomstores'] Members injected nearly $3,500,000 of cash in the form of long-term subordinated debt."  Trustee also testified as to the contents of the one-page consolidated balance sheet which was attached to the Trade Vendor Letters.

Trustee testified that the two largest classifications of unsecured creditors in Roomstores' bankruptcy were lessors and trade vendors.  The Trade Vendor Letters were sent only to trade vendors.[21]

Finally, Trustee testified about Exhibit 1, the proof of claim filed by Selznick at 306-1.  Trustee testified that the other two Roomstores members (Phil and Al Levitz) did not file proofs of claim.

### B.  Testimony of Ms. Selznick

Ms. Selznick testified that Selznick passed away on December 9, 2016, and she is handling Selznick's probate estate as the personal representative. Ms. Selznick worked at Roomstores between October 2004 and January 2016 and discussed its business with Selznick on a daily basis. Ms. Selznick discussed Selznick's employment at Roomstores between 1993 and 2015 and highlighted his time as merchandising manager. Ms. Selznick stated that Selznick's position as merchandising manager involved working with Roomstores' vendors. Ms. Selznick testified that Selznick was not a certified public accountant, nor did he have an accounting background.

---

[21] *Id.* at page 48, lines 14 – 15.

Ms. Selznick testified about the Selznick Claim and MasterMind Claim. Ms. Selznick stated her belief that Selznick "definitely" expected to be repaid on both loans and that when Selznick passed away he only had $150,000 in retirement funds between MasterMind and his 401K. Ms. Selznick discussed Exhibits 87, 89 and 90 and testified that these e-mails demonstrated Selznick's disapproval with how Roomstores' financials were being handled.

## IV.  LEGAL ANALYSIS

### A.  § 542[22] Turnover of Property

Under § 542(b),

an entity that owes a debt that is property of the estate and that is matured…shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

In a cause of action for turnover under § 542, the trustee has the burden of proof.  *In re Bruner*, 561 B.R. 397, 403 (BAP 6th Cir. 2017); *In re Crowson*, 431 B.R. 484, 489 (BAP 10th Cir. 2010); see also Collier on Bankruptcy, ¶ 542.03 (16th ed. 2019).

Section 553 permits a creditor to

offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against that the debtor that arose before the commencement of the case…

Section 553 does not create an independent right to setoff and has generally been understood to preserve the common-law right of setoff.  *In re Cascade Roads, Inc.*, 34 F.3d 756, 763 (9th Cir. 1994).  The burden of proving an enforceable right to setoff is on the party asserting the right.  *Matter of Pester Refining Co.*, 845 F.2d 1476, 1486 (8th Cir. 1988).

---

[22] Unless indicated otherwise, statutory citations refer to the U.S. Bankruptcy Code, 11 U.S.C. §§ 101 – 1532.

## B. Recharacterization of Debt as Equity

Bankruptcy courts have the authority to recharacterize claims in bankruptcy proceedings. *In re Fitness Holdings Intern., Inc.*, 714 F.3d 1141, 1147 (9th Cir. 2013) (overruling *In re Pacific Express, Inc.*, 69 B.R. 112 (BAP 9th Cir. 1986) and holding that a court may recharacterize an obligation that does not constitute "debt" under state law). "In order to determine whether a particular obligation owed by the debtor is a 'claim' for purposes of bankruptcy law, it is first necessary to determine whether that obligation gives the holder of the obligation a 'right to payment' under state law." *In re Fitness*, 714 at 1149 (citing *In re Lothian Oil*, 650 F.3d 539, 542-43 (5th Cir. 2011)). "When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996) (internal quotations and citations omitted).

The Court has not been supplied, nor has the Court found, an Arizona case which establishes a standard for determining whether an amount transferred to an entity is properly denoted as a loan or an equity investment.[23] In the absence of controlling Arizona law, Arizona courts look first to the Restatement and then to California law.[24] The Court found no reference to a standard in any Restatement nor in any case establishing a standard under California law.[25] Other states have applied a multi-factor test developed in the context of federal tax law. See *In re Lothian Oil*, 650 at 544 (stating that Texas courts imported a test from federal tax law to distinguish between debt and equity).[26] See also

---

[23] Plaintiff's citation to *Jackson v. Low Cost Auto Parts, Inc.*, 25 Ariz. App. 515, 517 (1976) is not particularly informative. That case simply stands for the proposition that, when substantial evidence is submitted to a trial court that refutes the contention that a sum of money was loaned as opposed to invested, that determination will be upheld.

[24] *In re Shields' Estate*, 15 Ariz. App. 447, 448 (Ariz. Ct. App. 1971) (stating that when statutes have been adopted from California, it is appropriate to look to interpretation of the California statutes for guidance.)

[25] A recent bankruptcy case in the Central District of California was similarly unable to find California state law addressing the question of when debt should be recharacterized as equity. *In re L. Scott Apparel, Inc.*, 2019 WL 1768235 at 57 (Bankr. C.D. Cal. January 29, 2019) (stating "It does not appear that California state law has definitely addressed the question of when debt should be recharacterized as equity.").

[26] *Lothian Oil* cites to the Texas case, *Arch Petroleum, Inc. v. Sharp*, 958 S.W.2d 475, 477 n. 3 (Tex. Ct. App. 1997) which then cites to *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968) for "an oft-cited discussion of the distinction between debt and equity, including a list of sixteen distinguishing factors."

7

*Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Investment Partnership, L.P.* (*In re Color Tile, Inc.*), 2000 WL 152129, at *4 (D. Del. 2000) (citing 7 factors including the intent of the parties). Other courts have applied slightly different multi-factor tests which also have their roots in federal tax law. *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749 (6th Cir. 2001) (adopting the 11-factor test used by the Sixth Circuit in the tax case *Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625).

As discussed below, this Court predicts that the Arizona Supreme Court would utilize most, if not all, of the *AutoStyle* factors when it ultimately has occasion to tackle the question of appropriate standards for a trial court to review in determining when an entity's debt should be recharacterized as equity.

### C. § 510 Subordination

Under section 510(c),

…after notice and a hearing, the court may –
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest…

Equitable subordination requires the court to make three findings: "(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1006 (9th Cir. 2006). The second element of the test requires the proponent of equitable subordination to demonstrate that the misconduct caused injury to the debtor or its creditors or resulted in an unfair advantage to the claimant. *In re 80 Nassau Associates*, 169 B.R. 832, 840 (S.D.N.Y. 1994). "Bankruptcy Courts must take care not to subordinate claims where doing so will operate only to penalize the claimant." *In re Westgate-California Corp.*, 642 F.2d 1174, 1178 (9th Cir. 1981). Courts should not subordinate a

claim where the value of the claim greatly exceeds the amount of damage inflicted by the claimant's inequitable conduct. *Id.*

Equitable subordination is a "dramatic remedy" that is "rarely granted." *In re GTI Capital Holdings, LLC*, 2007 WL 2493671 at 14 (Bankr. D. Ariz. Aug. 30, 2007). However, "[w]here the trustee seeks to subordinate 'a claim arising from the dealings between a debtor and an insider,' the court will give the insider's actions rigorous scrutiny." *Stoumbos v. Kilimnik*, 988 F.2d 949, 959 (9th Cir. 1993) (citing *In re Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991)).

## V.  FINDINGS AND CONCLUSIONS[27]

### A.  The Selznick Obligation

Count I of Plaintiff's Amended Complaint demands payment to the Trustee of what he claims is a fully matured debt in the amount of $835,268.65 ("Selznick Obligation") due and owing to the Debtor by Selznick at the Petition Date.  This amount presumably consists of the principal balance of $804,307.17 plus interest at the 4% annual rate reflected in the note[28] signed by Selznick on August 28, 2015.  However, the Court calculates the Petition Date balance on the Selznick obligation at $814,317 plus any fees and costs owed to the Debtor.[29]  Other than Exhibit 22, no evidence was introduced reflecting the present balance owed on the Selznick Obligation so this Court will use its own calculations indicated in the footnote below.

Through the introduction of Exhibit 22 and the testimony of the Trustee, Plaintiff has shown prima facie evidence of Selznick's debt to the Roomstores.  Defendants have not challenged the fact of Roomstores' transfers to Selznick totaling $804,307.17 except

---

[27] This Order constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

[28] See Ex. 22

[29] $804,307.17 x 4% = $32,172.29/year/360 days = $89.37/day. 112 days lapsed between the note date (August 28, 2015) and the Petition Date (December 18, 2015). 112 x $89.37/day = $10,009 + $804,307.17 = $814,317 owed on the Petition Date.

to contend that amount reflects capital distributions to Selznick and not a debt owed by Selznick to the Debtor.

In view of the Plaintiff's prima facie showing of the validity of the Selznick Obligation, Defendants bear the burden of proof on their contention that the Selznick Obligation must be recharacterized as a capital distribution to Selznick. Defendants point to a January 15, 2015 email from Selznick to Alan and Phil Levitz, his relatives and fellow owners of the Roomstores. In that email, Selznick stated "[t]he operating agreement [of the Roomstores] … prohibits any distributions when the assets of the company are or will be lower than its liabilities, which is the case at this time. Were the loans from the company to the members to be properly characterized as capital distributions, the negative equity increases by another $3,500,000."[30] The fact that Selznick signed his note to the Roomstores over eight months <u>after</u> this email not only undercuts Defendants' claim that the Selznick Obligation must be recharacterized as an equity distribution, it obliterates this argument.[31] Defendants provided no additional evidence supporting their contention.

Section 542 contains an exception to the requirement that a debt owed to a debtor be paid over to the trustee; namely, when the obligor has a § 553 right of offset. If a setoff is effectuated, the Selznick Obligation on the Petition Date ($814,317) would be reduced by the Selznick Claim ($101,316)[32] leaving a balance of $713,001 owed to the Trustee. On the other hand, if Selznick must pay the Selznick Obligation in full and await the arrival of distributions to unsecured creditors under the Debtor's confirmed Plan, Selznick would receive approximately $9,118 to $10,132.[33] The net effect to Selznick would be an obligation owed to Roomstores in an amount between $804,155 and $805,199.[34] This produces a variance of $91,930 to $90,916[35] depending on whether a setoff is appropriate or not. Selznick has presented no evidence to support a right of setoff nor does Plaintiff's

---

[30] Ex. 87, paragraph 2.

[31] Selznick, of course, could not explain this jarring conflict at trial because he passed away December 9, 2016.

[32] This assumes the Selznick Claim is allowed in full and not recharacterized as equity or subordinated under § 510(c). See the discussion below in Section V(B).

[33] According to Defendants' counsel, the allowed claims of unsecured creditors will receive 9 to 10 cents on the dollar. Trial Transcript at DE 64, page 111, lines 6 – 8.

[34] $814,317 - $10,132 = <u>$804,185</u>; $814,317 - $9,118 = <u>$805,199</u>.

[35] $805,199 - $713,269 = <u>$91,930</u>; $804,185 - $713,269 = <u>$90,916</u>.

closing brief argue that the Selznick Claim must be setoff against the Selznick Obligation. The Court will not order a setoff *sua sponte*.

The Court finds that Plaintiff sustained his burden of proving, under § 542, that the Selznick Obligation is matured and has been due and owing to the Roomstores since its December 31, 2016 maturity date. The principal amount of the Selznick Obligation is $804,307.17. Interest has been accruing on that principal amount at 4% from August 28, 2015. The Court also finds the Selznick Claim may not be offset against the Selznick Obligation under § 553. The Court further finds that the Defendants have failed to sustain their burden of proving that the Selznick Obligation should be recharacterized as a capital distribution to Selznick.

Since the note signed by Selznick contains a provision calling for his payment of attorneys' fees should Selznick not pay this debt when due, Plaintiff may file his application for fees and costs no later than January 24, 2020. Defendants' response, if any, shall be filed no later than February 7, 2020. Plaintiff's reply, if any, shall be filed by February 14, 2020. After reviewing these pleadings, the Court shall set a hearing on such application only if a hearing would be deemed by the Court to be useful.

B. The Selznick Claim

(1) Recharacterization of the Selznick Claim

Count III of Plaintiff's Amended Complaint seeks to reclassify the Selznick Claim as an equity investment in the Roomstores by Selznick, Count V seeks disallowance of that claim. Reclassification of a claim as equity is determined by application of state law. Since the Selznick Claim arose in Arizona, the Court must apply Arizona law to this issue. As noted above in Section IV(B), the parties have not directed the Court to controlling Arizona law on this question nor has the Count found an Arizona case which has decided the standards to use in making a determination of whether it is appropriate to recharacterize a claim as equity. A recent decision from the Central District of California's esteemed Judge Kwan notes that even California's state courts have not

11

definitively supplied an answer as to how trial courts are to analyze the recharacterization issue.[36]  Like Judge Kwan, this Court must predict what the highest state court would likely decide in view of this surprising legal vacuum.

At least one state court (Texas)[37] has developed a 16-factor test which is based upon criterion developed by federal tax courts.  The 6th Circuit[38] has developed a test which also finds its genesis in federal tax law.  While the Texas and 6th Circuit tests are not exactly the same, both cover essentially the same territory.  Delaware's 7 factor test differs a bit from both of these tests in that it explicitly incorporates a requirement that the court discern the parties' intent.[39]  Because the *AutoStyle* case is more widely cited and adopted by other courts, this Court predicts that the Arizona Supreme Court would likely find all or most of the *AutoStyle* factors applicable to recharacterization cases in Arizona.

In *AutoStyle*, the 6th Circuit identified 11 factors which trial courts are to review when analyzing whether a debt claim should be recharacterized as an equity contribution:

1. "[T]he names given to the instruments, if any, evidencing the indebtedness."

Roomstores' Operating Agreement permits its members to loan money to the LLC.[40]  Selznick's Claim #306-1[41] reflects an April 24, 2015 promissory note[42] payable to Selznick in the amount of $50,000 signed for Roomstores by Al Levitz.  Also attached to that proof of claim is an unsigned Roomstores note[43] to Selznick in the amount of $43,334.[44]  Roomstores' books and tax filings also reflect the Debtors' debt obligation to members of the LLC but do not specifically single out the amount of debts owed to Selznick.[45]  However, the Trustee points to the Trade Vendor Letters which indicate

---

[36] *L. Scott Apparel* at 57.
[37] *Arch Petroleum, Inc. v. Sharp*, 958 S.W.2d 475, 477 n. 3 (Tex. Ct. App. 1997).
[38] *AutoStyle* at 749-50.
[39] *In re Color Tile* at 4.
[40] Ex. 29, ¶ 6.7.
[41] Ex. 1.
[42] Exs. 1 and 21.
[43] Ex. 1.
[44] These note amounts plus the accrued interest reflected in Selznick's proof of claim are not challenged by the Trustee.  However, the Court noticed that the Selznick Claim of $101,316 is a bit less than reflected in the Trustee's Ex. 45.
[45] See Ex. 38, especially Note 4 to the 2011-2012 financial statements.  See also Schedule L to Exs. 39-43, the 2011 through 2015 tax returns of Roomstores.

Roomstores' members injected $3.5 million into this LLC between August 2008 and August 2010, "in the form of long term subordinated debt."[46] Included with those letters was a balance sheet reflecting subordinated debt of over $3.4 million. The Trade Vendor Letters do not indicate whose debt is subordinated or to whom those loans are subordinated. The Trustee reads the Trade Vendor Letters as indicating the members' cash infusions as being subordinated to all creditors, especially the claims of Roomstores' trade vendors. No subordination agreements were produced at trial. In fact, the only mention of written subordination agreements pertained to the members' agreements to subordinate their claims to the claims held by Northern Trust Bank. Footnote 4 to the 2011 and 2012 balance sheets of Roomstores reflects three amounts totaling $3,415,000 as "unsecured notes payable to a member . . . subordinated to Northern Trust Bank."[47]

Factor 1 weighs in favor of Selznick's position that the Selznick Claim were loans to Roomstores, not capital contributions.

2. "[T]he presence or absence of a fixed maturity date and schedule of payments."

The signed note referenced in the preceding paragraph has a maturity date of December 31, 2015. The unsigned note has a December 31, 2016 maturity date. Neither note contains a reference to interim payments.

Factor 2 weighs in favor of Selznick's position.

3. "[T]he presence or absence of a fixed rate of interest and interest payments."

The signed and unsigned notes from Roomstores to Selznick reflect an interest rate of 7% per annum. Roomstores' 2011 and 2012 financial statements at Note 4 reflect these same rates for two of the three member loans but reflect a 12% rate on the $50,000 note.[48]

Factor 3 weighs in Selznick's favor.

---

[46] Exs. 57-66.
[47] Ex. 38, page 11 of 15.
[48] None of the three loan balances reflected in Note 4 (i.e. $2,743,334, $621,666 or $50,000) indicate to which Roomstores member these debts are owed. The fact that the interest rates vary from the 4% rate Roomstores agreed to accept on the Selznick Obligation troubles this Court. This is discussed at the end of Section V(B).

4. **"[T]he source of repayments."**

As to this factor 4, the *AutoStyle* court stated:

> If the expectation of repayment depends solely on the success
> of the borrower's business, the transaction has the appearance
> of a capital contribution.

The signed and unsigned notes payable from Roomstores to Selznick simply indicate Roomstores as the obligor. No third party is reflected as a guarantor or as a likely source for repayment of these loans. More importantly, payment was not dependent on Roomstores' profitability.

Selznick wins factor 4.

5. **"[T]he adequacy or inadequacy of capitalization."**

The Court in AutoStyle held:

> Thin or inadequate capitalization is strong evidence that the
> advances are capital contributions rather than loans.

Roomstores' 2011 and 2012 financial statements and the 2011 through 2015 tax returns reveal significant "[d]eficit in members' capital"[49] or negative "[p]artners capital accounts."[50] Whether Roomstores was adequately capitalized *ab initio* or somewhere after its formation is unknown to the Court as no evidence was introduced to this effect. The Court does note that ¶ 2.1 of Roomstores' Operating Agreement claims the members "have previously made Capital Contributions to [Roomstores]."[51]

Factor 5 is unknown but since Trustee failed to sustain his burden of proof on this issue, factor 5 weighs in favor of Selznick.

6. **"[T]he identity of interest between the creditor and the stockholder."**

As to this factor, *AutoStyle* tells us that where

---

[49] Ex. 38.
[50] Exs. 39-43.
[51] Ex. 29, page 4.

14

> stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. *Ibid.* On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt.[52]

Trustee's people prepared Ex. 46 which reflects "2015 Subordinated Debt" owed by Roomstore to Phil Levitz in the amount of $3,445,134 and to Selznick in the amount of $101,693. No debt is reflected as owing to Al Levitz. Non-member MasterMind is reflected as being owed $1,285,600. Since membership interests are held in nearly equal proportion by Phil Levitz (33.5%), Al Levitz (33.5%) and Selznick (33%), it is clear that member advances to Roomstores were not in proportion to members' ownership interests.

Factor 6 favors Selznick.

7. "[T]he security, if any, for the advances."

According to the *AutoStyle* court,

> [t]he absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans.[53]

None of the member advances were secured by any of Roomstores' assets.

Factor 7 favors Trustee.

8. "[T]he corporation's ability to obtain financing from outside lending institutions."

When discussing factor 8, *AutoStyle*, stated

> [w]hen there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans.[54]

---

[52] *AutoStyle* at 751.
[53] *Id.* at 752.
[54] *Id.* at 752.

Selznick was indisputedly an insider of Roomstores. That said, the Court is a bit puzzled by this factor. If an equity interest holder advances funds to an entity partially owned by them, they may be doing so for reasons other than simply protecting or boosting their equity position. Advances can be made to protect their guarantee of the entity's debts to arms-length third party creditors. Equity holders may wish to cover an entity's cash shortages so payroll can be timely paid, so raw materials or inventory can be purchased or to enable the entity to take advantage of favorable credit terms from vendors. Equity holders may want to make sure the difficulties experienced by their entity does not impact their long-time faithful employees. On the other hand, equity holders may also advance money to their entity because they may have never adequately capitalized the entity. But, of course, if that is the case factor 5 has been met and factor 8 would be superfluous. The reasons for Selznick's loans to Roomstores were not explicitly revealed at trial.

Whether factor 8 should be included in the list of 11 or not, this factor weighs in favor of Trustee.

9. "[T]he extent to which the advances were subordinated to the claims of outside creditors."

*AutoStyle* held that "[s]ubordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."[55] Here, the Trustee argues that the language of the Trade Vendor Letters evidences a subordination of member loans to all Roomstores' creditors. This contention is, however, undercut by the fact that Roomstores' 2011 and 2012 financial statements identify subordination of member loans only to Northern Trust Bank.[56] Those financial statements were "Reviewed" by Dennis, Schmich & Co Ltd., an independent third party certified public accountant. The Court finds Selznick knowingly and voluntarily subordinated the Selznick Claim to only Northern Trust Bank and not to the trade vendors or other creditors of Roomstores.

Factor 9 weighs in favor of Selznick.

---

[55] *Id*. at 752.
[56] Ex. 38, Note 4.

10. "[T]he extent to which the advances were used to acquire capital assets."

Accordingly, to the *AutoStyle* court, advances for the entity to acquire capital assets, rather than for daily operating expenditures, signals a capital contribution.[57] Here, the Court received no explanation of how Selznick's advances were employed by Roomstores nor was any evidence submitted reflecting any capital purchases by Roomstores.

The Trustee has not sustained his burden of proof on factor 10. Selznick wins the 10th round.

11. "[T]he presence or absence of a sinking fund to provide repayments."

To the 6th Circuit, the absence of a sinking fund suggests an advance could be a capital contribution.[58] There was no evidence submitted by the parties suggesting the establishment of a sinking fund in this case. If the creation of sinking funds were ever the norm in arm's length, third party unsecured loan transactions, this Court can only note that they are rarely, if ever, seen by this Court in modern day non-governmental commercial lending transactions of this size.

This Court views factor 11 to be of very little importance but, to the extent it is of any use, it weighs in favor of Plaintiff.

In summary, 8 of the 11 *AutoStyle* factors weigh in favor of a finding that the Selznick Claim is a debt of Roomstores and not an equity contribution by Selznick to Roomstores. Moreover, the two factors favoring the Trustee's position (factors 8 and 11) are seen by this Court to be of very little significance. Factor 7 is, however, clearly a mark in Plaintiff's favor. Importantly, inequitable conduct is not one of the factors to be reviewed in a case of debt recharacterization.[59] As will be seen below, this is one of the primary differences between recharacterization and equitable subordination.

---

[57] *AutoStyle* at 752.
[58] *Id*. at 753.
[59] *Debt Recharacterization During an Economic Trough: Trashing Historical Tests to Avoid Discouraging Insider Lending*, 71 Ohio St. L.J. 187, 198 (2010).

17

The *AutoStyle* 11 factor test is not a mathematical matter where the party with the greatest number of factors in their favor wins.[60] Some of the 11 factors are more important than others, at least in the context of this case. A fixed maturity date and fixed interest rate are hallmarks of debt whereas no interest rate and no date certain for repayment[61] are more indicative of equity. Whether the distressed borrower could not obtain outside third party financing or whether the insider lender obtained collateral for this loan are much less compelling factors in this Court's analysis of recharacterization. One commentator[62] suggests these factors should be ignored because insiders are the very people who best understand a borrower's potential and have the desire that the borrower reach that potential.[63] Moreover, this commentator suggests (correctly) that a collateralized insider loan should not be a sign of true debt because doing so would dilute assets available to pay non-insider creditors.[64] As a matter of public policy, the Court does not view this as a motivation courts should encourage.

The adequacy of capitalization (factor 5) is an interesting matter. If anything, this factor should review whether the borrower was initially adequately capitalized to engage in the type of business it set out to conduct. If so, subsequent negative capital positions should not necessarily count against the now troubled borrower. Here, the Court received no evidence of whether Roomstores was or was not adequately capitalized at its inception. It is true, however, that by 2010, Roomstores' members found themselves in a state of woefully negative capitalization.[65] From a balance sheet perspective the members' ownership interests were worthless by 2010 and remained underwater through the Petition Date. Why would a member advance new money as equity contributions when Roomstores' capital deficit exceeded $3 million throughout this time period? This question was not answered by the parties. Ms. Selznick, however, testified that her father

---

[60] *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 572 (Bankr. D. Del. 2012).
[61] Calling for repayment when the borrower returned to profitability was found by the 4th Circuit in *Dornier Aviation*, 453 F.3d 225 (4th Cir. 2006), to be an important factor in the court recharacterizing the "loan" as equity.
[62] *Id.*
[63] *Id.* at 221.
[64] *Id.* at 219.
[65] See Ex. 44.

18

and his pension plan advanced money to Roomstores expecting to be timely repaid with interest. Payment was not contingent upon Roomstores' future profitability or any other future event.[66] Payment was due on a specified maturity date, per the promissory notes signed by Roomstores.

The Court finds Selznick and MasterMind intended that their advances to Roomstores be repaid when due and that these advances be treated and accounted for by Roomstores as debt, not equity. Roomstores likewise intended that these advances be treated and accounted for as debt. Roomstores' tax returns[67] and its 2010 and 2011 financial statements reflect this intention.

This, however, does not fully resolve all concerns involving the Selznick Claim. The Selznick Obligation was incurred by Selznick after the Selznick Claim was established. Roomstores agreed to pay Selznick at the rate of 7% per annum while only charging him 4% per annum for the Roomstores' loan to him. All other terms of the Selznick Claim were reasonable, but the Court finds this interest rate disparity commercially unreasonable under the circumstances of this case. The Selznick Claim is to accrue interest at the same rate Selznick was being charged by Roomstores, i.e. 4% per annum.

Based on the intent of the Roomstores and the Defendants and that this Court finds the most important *AutoStyle* factors weigh in favor of Selznick, the Court finds the Trustee has not sustained his burden of demonstrating Selznick's advances to Roomstores were capital contributions. That portion of Plaintiff's Amended Complaint (Counts III and V, as they pertain to Selznick) are rejected. The principal amount of the Selznick Claim is allowed in the amount of $93,334 plus interest at 4% per annum.

---

[66] The 4th Circuit found that, where a borrower's obligations to its insider was not due until the borrower became profitable, it was appropriate to recharacterize debt as equity. *Dornier Aviation* @ 235.
[67] Exs. 39 through 43.

19

(2) <u>§ 510(c) Subordination of the Selznick Claim</u>

Before a claim against a debtor can be subordinated under § 510(c), the Ninth Circuit[68] requires the party seeking subordination to carry its burden of proof on three points. These points are described and discussed as follows:

The claimant (here, Selznick) must have engaged in some type of inequitable conduct. The Trustee contends that Selznick's Trade Vendor Letters constitute inequitable conduct if Roomstores' members had not actually subordinated their claims to all other creditors of Roomstores. Since Selznick is an insider of Roomstores, his actions must be "rigorously scrutinized."[69] Even if the Court adopts the Trustee's position on this point[70] and on the third point[71] required by the Ninth Circuit, the Court finds the Trustee has not carried his burden of persuasion on the second point. This second element requires proof that Selznick's misconduct caused (1) injury to creditors or (2) conferred an unfair advantage to Selznick. Trustee would have this Court find that dilution of the distribution to unsecured creditors is the creditor injury which satisfies this second element. However, Selznick's Trade Vendor Letters did not <u>cause</u> dilution of creditor claims. It is possible those letters may have caused trade vendors to advance credit to Roomstores or induce existing creditors to forebear from taking action against Roomstores. Such vendor action or inaction, however, was not proven at trial. No evidence from any creditor was produced. The Court will not presume the Trade Vendor Letters <u>caused</u> any vendor to act or refrain from acting. Selznick's conduct (if such conduct was found to be inequitable) was not proven by Trustee to cause injury to any creditor of Roomstores. Moreover, the Trade Vendor Letters were not sent to all Roomstores' creditors.[72] Significant claims against the Debtor's estate are held by Debtor's landlords who admittedly were not

---

[68] *In re First Alliance Mtg. Co.* at 1006.

[69] *Stoumbos v. Kilimnik* at 959.

[70] For the record, the Court is not finding in Trustee's favor on this first element. Among other things, the Trade Vendor Letters do not clearly announce which members advances are subordinated or whether they are subordinated to all creditor claims or just the claims of Northern Trust Bank.

[71] Point 3 requires a finding that "[s]ubordination is not inconsistent with the Bankruptcy Code." *In re First Alliance Mortg. Co.*, 471 F.3d at 1006. The Court agrees the Trustee has carried his burden of proof on this third point.

[72] As noted above in Section III(A), Exhibits 57 – 66 were letters addressed to vendors. See Trial Transcript at DE 64, page 48, lines 14 – 15.

Case 2:17-ap-00336-DPC    Doc 70    Filed 01/10/20    Entered 01/10/20 16:48:21    Desc
Main Document    Page 20 of 23

recipients of the Trade Vendor Letters.[73] Subordinating Selznick's Claim to all of Roomstores' creditors would unfairly penalize Selznick. Furthermore, it is not clear to this Court that Plaintiff could properly demonstrate to which creditor claims Selznick should be subordinated. This form of picking and choosing was the remedy ordered by the 9th Circuit in *Stoumbos v. Kilimnik*, 988 F.2d at 960-61.

The Court also finds that Selznick's inequitable conduct, if any, did not confer unfair advantage on Selznick. When Selznick sent the Trade Vendor Letters he had already advanced significant funds to Roomstores and some of those amounts remain owed to this date. Trustee has not proven what unfair advantage was conferred upon Selznick by virtue of his sending the Trade Vendor Letters. The Court finds Plaintiff failed to prove Selznick's causation of injury to creditors or causation of unfair advantage to Selznick.

Based on the foregoing, the Court denies Trustee's Count III subordination claims against Selznick and also denies Trustee's Count V demand for disallowance of the Selznick Claim based on subordination.

C. <u>The MasterMind Claim</u>

1. <u>Recharacterization of the MasterMind Claim</u>.

Count III of the Amended Complaint seeks to recharacterize the MasterMind Claim as equity. The Court's analysis of the Trustee's efforts to recharacterize the Selznick Claim is equally applicable to the MasterMind Claim,[74] with one important addition. *AutoStyle's* factor 6 requires the Court to examine the identity of interests between the creditor and equity holder. While Selznick owned a membership interest in the Roomstores and also "loaned" money to the Roomstores, MasterMind (although wholly

---

[73] Trustee testified that "the two largest classifications [of general unsecured creditors] were rejected lessors and vendors." See Trial Transcript at DE 64, page 46, lines 13 – 16. Also, the Joint Chapter 11 Plan of Reorganization at Administrative DE 549 provides for the treatment of all general unsecured creditors in Class 4 and does not distinguish between vendors and lessors.

[74] The MasterMind Claim is an unsecured claim memorialized in a $260,000 signed note dated April 24, 2015, which calls for interest at 7% and a maturity date of December 31, 2015, as well as an unsigned note in the principal amount of $621,666 calling for a December 31, 2016 maturity date.

owned by Selznick) owned no membership interest in the Roomstores limited liability company. This fact makes the Trustee's recharacterization claim ever more tenuous. Importantly, the Court has been shown no evidence that MasterMind is one and the same as Selznick or was Selznick's alter ego or his instrumentality. The Court will not pierce the MasterMind pension plan to find it to be one and the same as Selznick. As with the Selznick Claim (and for the same reasons), the MasterMind principal balance of $881,666 shall accrue interest at 4% per annum, not the 7% rate set forth in the signed and unsigned notes.

For the reasons stated in this subsection, as well as the reasons stated in Section V(B) above, the Court rejects Plaintiff's claims to recharacterize the MasterMind Claim as equity.


2. <u>Subordination of the MasterMind Claim</u>.

Count IV of Trustee's Amended Complaint seeks to subordinate the MasterMind Claim under § 510(c) while Count V seeks to disallow the MasterMind Claim for the same reasons. The Court's rationale for denying Trustee's claims to subordinate the Selznick Claim are equally applicable to the MasterMind Claim but with the additional facts that MasterMind held no equity interest in Roomstores. Moreover, Selznick, not MasterMind, engaged in the so-called inequitable conduct. These facts strengthen MasterMind's position on elements (1) and (2) of the Ninth Circuit's requirements in finding equitable subordination. Selznick, not MasterMind, sent the Trade Vendor Letters. Those letters did not refer to subordination of MasterMind's Claim because those letters refer only to cash infusions by "members" "in the form of long-term subordinated debt."

The Court finds Trustee failed to carry his burden of persuasion on his Count III subordination claims as to the MasterMind Claims and as to his Count V disallowance of the MasterMind Claim based on equitable subordination.

## VI.    CONCLUSION

After considering the evidence at trial, hearing the arguments of counsel and reading the parties' briefs, the Court now rules that Selznick owed the Roomstores bankruptcy estate $814,317 on the Petition Date plus interest thereafter on the principal balance at 4% per annum.  If Plaintiff seeks an award of attorneys' fees in connection with the Selznick Obligation, he must apply to this Court as more fully discussed in Section V(A), above.

The Court finds that Plaintiff failed to carry his burden of proof on his claims for equitable subordination.  The Court also finds Plaintiff (except as noted above) failed to sustain his burden of proof of his claims for state law recharacterization of debt as equity.  Therefore, Selznick's Claim #306-1 is allowed in the principal amount of $93,334 plus interest at 4% and MasterMind's Claim #307-1 is allowed in the principal amount of $881,666 plus interest at 4%.  Since Selznick failed to demonstrate that his liability to Roomstores is entitled to setoff against the debt Roomstores owes Selznick, Selznick must pay the full amount owed to Roomstores while the Selznick Claim against Roomstores is entitled to share pro rata in the 9% to 10% return expected to be paid to unsecured creditors.

Defendant shall lodge with this Court a judgment consistent with this order.

23